IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED
2005 FEB 22 P 2:36

JUDGE:________________

CASE NO. CV 05-114-L 63-M

ZELKJO ANIC
BOLERO LLC
20 Blaine Street
Manchester, New Hampshire 03102

v.

ROBERT LAFONTAINE
122 Day Street
Manchester, New Hampshire 03104

AND

TOWER REALTY GROUP
1000 Elm Street
Manchester, New Hampshire 03101

CERTIFIED TO BE A TRUE COPY
JAMES R. STARR, CLERK
BY: Judith Barrett
DEPUTY CLERK 3-11-05

JURY DEMAND ENDORSED HEREON

COMPLAINT AND EX PARTE PETITION
FOR LIMITED TEMPORARY RESTRAINING ORDER,
AND FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

NOW COMES the Plaintiff/Petitioner in the above matter, Zelkjo Anic/Bolero, LLC, at this point filing *pro se* to reduce legal costs, and pursuant to 28 U.S.C. 1331, 42 U.S.C. 1981 and Federal Rules of Civil Procedure 65, to posit this Complaint and Petition for TRO and Injunctive Relief, and for the subsequent entry of preliminary and permanent injunctive relief and the award of damages following notice and hearing as he has **DIRECT EVIDENCE** of unlawful discrimination.

## I. THE PARTIES and BACKGROUND FACTS

1. Plaintiff is the Bosnian-born Lessee of a Commercial Lease seen at **Appendix 1.** He quit his engineering job earning $50,000.00 per year to redo the empty warehouse, adding three (3) bathrooms, full kitchen, full bar and other improvements, with the full and express knowledge and permission of Lessor, who witnessed it. He operates the facility under Bolero, LLC and maintains control as Chief Member of Bolero, LLC.

2. Defendant Bob Lafontaine ("Defendant Lafontaine") is, based on information and belief, the owner of the subject property and Lessor.

2

3. Defendant Tower Realty Group is the management company that may or may not be an agent of Defendant Lafontaine.

4. Plaintiff has at no time been in material breach of any Lease term or condition, and is not currently late on any payments for utilities or rent.

5. Defendants have continually disturbed Plaintiff's Right to Quiet Enjoyment of his premises, and have otherwise materially violated the Contract, by actions including, but not limited to:

6. Falsely accusing Plaintiff of a number of items including violence, destruction of property, and other false claims, none of which has been proven and none of which implicates fault or responsibility of Plaintiff. In the two years that Bolero has been operating there was a stabbing on Elm Street that had nothing to do with Bolero whatsoever, there was some trash in the parking lot so a parking lot monitor system was set up and one (would-be) customer who was turned away backed his car into a neighboring shop front. **Appendix 2.**

7. In fact, general counsel for Plaintiff, attempting to expeditiously address this matter without wasting legal or monetary resources, noted the blatant falsity of the allegations in a specifically itemized letter to Defendant Tower Realty attached hereto as **Appendix 3**.

8. Defendants have yet to issue any substantive response to such itemized rebuttal and Plaintiff plans to call Manchester Police as witnesses to the integrity and peaceful nature of Bolero's clientele. To Plaintiff's knowledge there has never been a police call to Bolero, a rare fact for a Manchester club.

9. Plaintiff and counsel have issued dozens of telephone calls to Defendants regarding the issue and Defendants failed to return any of these calls, said calls which will be specifically identified via wireless telephone logs.

10. Rather than telephone or otherwise contacting Plaintiff, Defendants harassed him yet again by sending a letter dated 16 November, three (3) weeks later, alleging unidentified "far more issues outstanding besides rent" and demanding the electric bill of $403.14, as seen at **Appendix 4**. Plaintiff has paid that amount in full, as noted at **Appendix 5.**

11. For exactly one (1) time in this two (2) year contract, Plaintiff canceled a check for rent, owing to a pressing personal matter, making good on it within the next calendar week, with a late fee, as noted in the United State Postal Money Order *vis a vis* Defendant's letter of 18 November, 2004, as seen at **Appendix 6.**

12. **Curiously, all of Plaintiffs problems started during the late summer of 2004 after he heard Defendant Lafontaine tell him at Lafontaine's office: "I don't like Blacks."[1]**

13. **Shortly after that, and well prior to 15 October, 2004, Plaintiff and his associates at Family Affairs Records began posting fliers for Hip-Hop, Reggae and R & B music – traditionally Black-inspired and attended musical genres. See sample fliers Appendix 7.**

14. On 15 October, 2004, as if on cue, Defendant Tower Realty (by and through one Scott Forrester who signed as agent of Defendant Lafontaine) delivered a Notice to Quit seen at **Appendix 8.** 8(a) None of the charges alleged in it had any substantial basis in fact, and the matter was basically dropped until 9 December, 2004.

15. On 9 December, 2004 Defendant issued a letter that counsel for Plaintiff would later call fraudulent because it stated that he or Bolero were "no longer a tenant in the building," despite the fact that no legal proceeding had ever been followed through on pursuant to Chapter 540. Appendix 8(b)

16. At that point Plaintiff issued the letter dated 15 December, 2004 and filed for injunctive relief in state court. **Appendix 9.**

---

[1] Subsequently Defendant Lafontaine would tell Plaintiff that he wanted to use part of his dance floor and pool table room as a VIP lounge for a gentleman's club that would be based next door. Plaintiff asserts that Defendant Lafontaine can have that dance floor, pool table area and whatever else he wants just as soon as Plaintiff is done exercising his right to extend his Lease by one year, to terminate 31 December, 2006.

17. At the hearing on 23 December, 2004, the Court denied the sought relief because Bob Lafontaine was not named as Defendant. Plaintiff informed Defendant that he would be seeking tortuous interference claims against Tower Realty Group, causing counsel for Tower Realty Group to issue a profanity in the direction of general counsel for Plaintiff, who immediately documented it as well as the fraudulent statement referenced in para. 15, *supra*. **Appendix 10**.

18. On or about 3 February Defendant Lafontaine caused a copy of a Notice to Quit to be sent to the law office of Crnilovic-Phillips, this time with the *caveat* that a Sheriff was actually supposed to serve it. **Appendix 11.**

19. Next, at **Appendix 12,** are four unanswered letters dated 3 January, 8 February, 12 February and 18 February from general counsel to Defendant Lafontaine, advising him of the historical importance of Bolero, as well as the likelihood of pursuing this Action.

## II. GROUNDS AND NEED FOR EQUITABLE AND OTHER RELIEF

### A. REQUEST FOR LIMITED, TEMPORARY EX PARTE RELIEF WITH RESPECT TO BASELESS DEMANDS FOR VACATION OF PREMISES AND ORDER FOR DAMAGES ON SAME

20. The contract between the parties grants Defendants the right to collect interest for late rents. Defendants cannot show where Plaintiff has not paid such amounts for any late rents, yet and still they harass him with letters demanding that he vacate the premises, such threats violating his right to quiet enjoyment and to support his family. Defendants must cease and desist such baseless demands, forthwith. Further, Defendants have alleged that Plaintiff owes them funds for events that are legally not his responsibility, such as fights that occurred a mile away, on Elm Street, as noted at **Appendix 3,** *supra*.

B. GENERAL STANDARDS FOR INJUNCTIVE AND OTHER RELIEF

21. 42 U.S.C. 1981 provides for nongovernmental and governmental discrimination and read, in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

22. An injunction will issue if there is an immediate danger of irreparable harm to the party seeking the injunctive relief, there is no adequate remedy at law and the party seeking the injunction has demonstrated the likelihood that it will succeed on the merits of its claims. UniFirst Corp. v. City of Nashua, 130 N.H. 11 (1987).

23. **Plaintiff has a clear likelihood of success on the merits of the claims asserted in this matter**.

In the case at bar, Defendants are attempting to shut Plaintiff down in substantial part because he has a healthy Wednesday night crowd that is 80 per cent Black, listening to predominately Black music. As such, he is vested with a derivative right to forward this complaint and of course should the Court determine otherwise he will simply join another representative Plaintiff. Further, Defendants Lafontaine and Tower Realty have demonstrated only that they intend to endlessly harass Plaintiff and act in a manner consistent with anticipatory breach and tortuous interference, respectively. Plaintiff has the clear right to be free from interference from a Landlord who "doesn't like Blacks" and his agents. It is DIRECT EVIDENCE of racial discrimination, and short of "keep those niggers out of here," there is no more offensive comment that Defendant Lafontaine could have issued.

24. **<u>As a result of defendants' actions, Plaintiff has suffered and continues to suffer immediate and irreparable injury for which there is no adequate remedy at law</u>**.

In particular, each and every day Plaintiff Anic awakes he must wonder whether or not his possessions will be wrongfully set out or whether he will need to pay his attorneys for advice. Such burden is reprehensible and does not permit him to conduct his affairs, thereby substantially denying him quality of life, and the benefit of the bargain he initiated more than two (2) years ago.

25. **<u>The burden imposed upon defendants by the limited *ex parte* temporary relief is minimal.</u>**

Defendant must simply abide by the terms of the Lease as drawn between the parties, rather than grasping at straws to try to evict. This is merely preservation of the status quo until Defendants can actually show the Court some sort of material breach, which they cannot do. To this point the Defendants have issued statements about the sale of liquor on the premises, yet the Lease specifically contemplates a restaurant and related services, and Defendant Lafontaine has been aware of the fact that Mr. Anic constructed a full-service bar, and in fact Defendant Lafontaine directly benefits from the presence of such bar, in this Lease and as a permanent fixture. Plaintiff requests minimal or token bond amount, if any need be levied.

26. **<u>The benefit to the common good is substantial:</u>**

It is a beautiful thing to have the only Yugoslavian/Bosnian club in Southern New Hampshire hosting non-violent Hip-Hop/Soul and Reggae music evenings. That sort of unity embodies the true spirit of American Values, and Plaintiff therefore looks to this Honorable Court for refuge from a less than honorable landlord.

27. Plaintiff also is entitled to the recovery of all costs and attorneys' fees per code.

Plaintiff hereby requests that this cause be heard by a duly empaneled Jury of appropriate composition.

## III. CAUSES OF ACTION

A. 42 U.S.C. 1981

29. The circumstantial and direct evidence of racial animus in this context provides Plaintiff with derivative rights to file and to maintain a 42 U.S.C. 1981 Complaint against both Defendants.

B. BREACH OF CONTRACT/NON-COMPLIANCE and LOSS OF RIGHT TO QUIET ENJOYMENT OF PREMISES.

30. The instrument that governs the operation and conduct of the Parties constitute an agreement and contract between the Parties that demand that they each abide by and comply with the provisions of said instrument.

31. Defendant Lafontaine is obliged, and agreed to abide by the Instrument and all other lawful rules and regulations of R.S.A. 540 and any and all other applicable law at equity, and/or common law.

32. Defendant breached its obligations under the contract by repeatedly demanding vacation without just grounds.

33. As a result, Plaintiff has been denied the benefit of the bargain and his right to quiet enjoyment of the premises.

C. TORTOUS INTERFERENCE

34. Defendant Tower Realty Group successfully argued at the stateside TRO hearing that Defendant Lafontaine was not named in that Action and that they were not a proper party to it. Having seen Appendix 8, however, with Scott Forrester's signature as "Agent" of Landlord, Plaintiff posits that Tower Realty Group may indeed be sued directly for breach of contract, but if not, then Tower Realty Group may certainly be sued for Tortous interference in the alternative as they cannot have it both ways.

## IV. DAMAGES AND DEMANDS

35. As a direct and proximate result of said breaches, plaintiff has suffered and continues to suffer the harm and damages described herein, including but not limited to, the inability reasonably conduct his affairs, and legal fees and costs incurred by plaintiff in attempting to ensure Defendant's compliance with said provisions, all within the minimum and maximum jurisdictional limits of this Court.

36. Plaintiff is entitled to monetary damages and injunctive relief as contemplated by Law.

37. That defendants be ordered to compensate plaintiff for all monetary damages caused by defendants' actions, including but not limited to, each and every letter written by general counsel.

38. That defendants be ordered to pay plaintiff's attorneys' fees and costs as allowed by Law.

39. That this Court grant such other and further relief as is just or necessary.

Respectfully submitted,

Dated: 22 February 2005

By [signature]
Zelkjo Anic
20 Blaine Street
Manchester, NH 03101

## VERIFICATION

I, owner of Bolero, hereby certify that I have read the foregoing petition, and the facts set forth therein are true and accurate to the best of my knowledge and belief.

Dated:

[signature]
Zelkjo Anic NH DL #12ACZ61221

STATE OF NEW HAMPSHIRE
HILLSBOROUGH, SS

Personally appeared before me the above named Zelkjo Anic, and gave oath that he is the duly authorized chief Member of Bolero, LLC, is authorized to sign this petition on behalf of Bolero, LLC, and that the foregoing factual allegations are true and accurate to the best of his knowledge and belief.

Dated: 2/22/05

CARISSA SIERRA
Notary Public - State of Florida
MyCommissionExpires Jan 27, 2008
Commission # DD 285573
Bonded By National Notary Assn.

[signature]
Notary Public

My commission expires: 1/27/08

S2L
45
(S6.I9)

# COMMERCIAL LEASE

Robert N LaFontaine 668-6612

Ex 14

This Lease is entered into effective this 1st day of September , 2002 by and between ~~Blaine Brown~~ Corp., a New Hampshire Corporation with a principal business address of 20 Blaine Street, Manchester, NH (LESSOR) and ~~Zelkjo Anic of 325 Mast~~ Rd., Manchester, ~~NH and Dalibor Kosic of 642 Union~~ St., Manchester, NH (LESSEE). Bolero LLC (Lessee)

In consideration of the mutual promises, covenants and guarantees contained herein, the parties agree as follows:

Both Names (Grantors)

## ARTICLE 1 - PREMISES AND TERM

**1.1 Premises.** The LESSOR hereby leases to the LESSEE the Premises which include the rear warehouse (approximately 3,000 square feet) (3600) located at 20 Blaine Street, Manchester, NH.

**1.2 Term.** The term of the lease shall be for three (3) years beginning on January 1, 2003.

**1.3 Option To Extend.** The LESSEE shall have the option to extend this lease for an additional year on the same terms and conditions as are stated herein.

To exercise this option, the LESSEE shall provide the LESSOR with written notice of its election to make such a renewal 3 months prior to the expiration of the term of the original or any extension lease period, provided that LESSEE is not at the time or thereafter in default in the payment of rent or in the performance of any of its other obligations hereunder.

## ARTICLE 2 - RENT

**2.1 Rent.** The LESSEE shall pay the LESSOR, without prior notice or demand, an initial monthly rent for the Premises of Two thousand two hundred ($2,200) Dollars, beginning January 1, 2003 without offset or deduction to Landlord beginning on the first day of the term and continuing on the first day of each month thereafter during the remainder of the term. The monthly rent may be adjusted from time to time based on the expense of LESSOR'S mortgage financing.

2.1a **Lessee's Access; Security Deposit**. LESSEE shall be permitted access to the premises upon payment of first month's rent,$2200, last months rent, $2200, and security deposit, $2200, totaling $6600 payment to LESSOR. Such security deposit shall be maintained in a non-interest bearing account until expiration or other termination of this Lease, subject to application to any damage to the premises caused or allowed by LESSEE or costs incurred by LESSOR to enforce the terms of this Lease.

**2.2 Additional Charges.** In addition to the rental payment specified in Section 2.1, the LESSEE shall pay all charges assessed against the premises in the form of real estate taxes, special assessments by any governmental unit, monthly maintenance and common grounds charges, and any other commonly shared expenses, including but not limited to water, sewerage, or other utility fees. LESSEE shall pay to LESSOR on the first day of every month, in advance, a sum equal to that reasonably estimated by LESSOR for such

Appendix 1

St9

purpose at or about the commencement of the term, such payments to represent payments on account of LESSEE's obligations under this Section.

All such charges shall be in the same proportion as the floor area in the leased premises bears to the total floor area in all the buildings located at the Premises.

Unless the LESSEE arranges for the installation of a separate heating system for the Premises, LESSEE shall pay LESSOR 20% of LESSOR'S heating bill within ten (10) days of LESSOR'S presentation of any such heating bill to LESSEE.

LESSEE shall be responsible for 20% of any increase in property taxes above the base year 2002, and shall pay LESSOR 20% of such property tax increase within ten (10) days of LESSOR'S presentation of such tax bill to LESSEE.

For tax years during which the term of this lease begins and ends, LESSEE shall pay a pro rata portion of all above-mentioned charges.

**2.2.1 Overpayment and Underpayment of Additional Charges.** If for the calendar year in question LESSEE'S pro rata share of the additional charges exceeds or is less than the aggregate of the payments, an appropriate adjustment will be made and LESSOR shall submit to LESSEE a statement setting forth LESSEE'S pro rata share thereof. LESSEE shall pay to LESSOR within 30 days from the statement date LESSEE'S pro rata share of any underpayment. LESSOR shall apply LESSEE'S pro rata share of any overpayment to LESSEE'S next rent payment due after the statement date.

**2.3 Penalty for Late Payment of Rent.** A late payment penalty of

(a) eighteen percent (18%) per year, or

(b) the highest lawful rate of interest which LESSOR may charge to LESSEE without violating any applicable law

of the rent owed will be assessed on any rent not paid within ten (10) days when due. Such interest shall constitute additional rent payable hereunder.

## ARTICLE 3 - UTILITIES, MAINTENANCE AND IMPROVEMENTS

**3.1 Utilities.** The LESSEE shall promptly pay all rates and charges which may become payable for electric current, steam, telephone or other utilities used on the premises during the full term of this lease whether individually metered, as part of the additional charges in Section 2.2 above, or both. Utilities shall be determined by paying 33% of total building expense. LESSOR shall pay the heat.

**3.2 Maintainance and Repair.** The maintenance and repair of the leased premises shall be governed as follows:

**3.2.1 Maintainance and Repair by LESSOR.** LESSOR shall maintain and keep in good repair the roof, outside walls, foundations, sidewalks and drainage of the leased premises, and all other structural members necessary to maintain the structural integrity of the premises.

**3.2.2 Maintenance and Repair by LESSEE.** Repairs to interior walls, bathrooms, interior plumbing and electrical lights, floors and ceilings and to any other portion of the premises, except as described in Section 3.2.1 above, shall be made by the LESSEE. LESSEE shall keep all and every part of the leased premises

Put Bathrooms in
Everything in working order

in good repair and replace all glass which may be broken on the leased premises, from any cause whatsoever, with other of the same quality and size, at its own cost and expense, and pay all repair bills promptly.

**3.3 Improvements by LESSEE.** LESSEE shall not make any alterations, additions, or improvements to the premises without the prior written consent of the LESSOR.

**3.2.1 LESSEE'S Expense.** All alterations, additions, or improvements to the premises made by LESSEE are at LESSEE'S expense, including fitup for plumbing and electric.

**3.2.2 Improvements Become Property of LESSOR.** All alterations, additions, or improvements to the premises shall be the property of the LESSOR and shall remain upon and be surrendered with the premises as a part thereof at the termination of this lease, without compensation to the LESSEE.

## ARTICLE 4 - MACHINERY, EQUIPMENT, AND TRADE FIXTURES

**4.1 Removal.** All machinery, equipment, appurtenances, furniture, furnishings and movable trade fixtures installed in the leased premises shall be deemed to remain personal property and all such machinery, equipment, appurtenances, furniture, furnishings and movable trade fixtures of the LESSEE or of any employee, agent, subcontractor, or subtenant of the LESSEE, may be removed prior to the expiration of this lease or at its earlier termination for any cause herein provided for; AND,

**4.1.1 Damage Caused by Removal.** The LESSEE shall repair any damage occasioned by such removal and shall restore the facilities on the leased premises to their conditions as at the beginning ~~of the~~ term hereof, reasonable wear and tear, taking by eminent domain, and damage insurable under the standard New Hampshire fire insurance policy with extended coverage excepted.

**4.2 Failure To Remove.** Any such property which is not removed prior to the expiration or earlier termination of this lease may be removed from the premises by the LESSOR and stored for the account of the LESSEE.

**4.2.1 Failure to Reclaim Property by LESSEE.** If the LESSEE fails to reclaim such property within 10 days following the expiration or earlier termination of this lease such property

(a) shall be deemed to have been abandoned by the LESSEE, **AND**

(b) may be appropriated, sold, destroyed, or otherwise disposed of by the LESSOR without notice to the LESSEE and without obligation to account therefor, **AND**

(c) the LESSEE shall pay to the LESSOR the cost incurred by the LESSOR in removing, storing, selling, destroying or otherwise disposing of any such property.

## ARTICLE 5 - THE PREMISES, LESSEE'S DUTIES, AND ACCESS BY LESSOR

**5.1 Condition of Premises.** The LESSEE hereby acknowledges that it has inspected the premises and that it accepts them in their current condition. LESSEE further acknowledges (1) that LESSOR has not made and does not make any representations regarding the physical condition of the premises and (2) that there are no warranties,

either expressed or implied, regarding the condition of the premises. Any such warranties which may exist, are hereby expressly released and waived.

**5.2 Use Of Premises.** The LESSEE agrees that it shall use the premises for purposes of providing the sales and services of a home improvement contracting company.

**5.2.1 Condition Of Premises.** The LESSEE agrees to keep the premises and all parts thereof in a clean and sanitary condition and free from trash, inflammable material, and other objectionable matter.

**5.2.2 Premises On Ground Floor.** If this lease covers premises, all or part of which are on the ground floor, LESSEE agrees to keep the sidewalks in front of such ground floor portion of the premises clean and free of obstructions, snow, and ice.

**5.3 Unlawful, Extra-Hazardous, Or Nuisance Use.** The LESSEE shall not injure or deface the premises nor occupy or use, or permit or suffer the premises or any part thereof to be occupied or used, for any unlawful or illegal business, use or purposes, nor for any business, use or purpose which is disreputable or extra-hazardous, nor in such manner as to constitute a nuisance of any kind nor for any purpose nor in any manner which would increase the premiums for fire insurance with extended coverage for the premises.

**5.3.1 LESSEE's Discovery.** The LESSEE shall, immediately upon discovery of any such unlawful, illegal, disreputable or extra hazardous use, take all necessary steps, legal and equitable, to compel the discontinuance of such use and to oust and remove any subtenants, occupants or other persons guilty of such unlawful, illegal, disreputable or extra-hazardous use.

**5.4 Licenses And Permits.** The LESSEE shall procure any licenses or permits required by any use of the premises by the LESSEE.

**5.5 Indemnification Of LESSOR.** The LESSEE shall defend, indemnify and save the LESSOR harmless from and against any and all civil claims, demand, liabilities, costs and expenses, including reasonable counsel fees, asserted by third parties and arising out of or by reason of any breach or violation by the Lessee of the provisions of this section.

**5.6 Access To The Premises.** The LESSOR or their representatives shall have free access to the leased premises at reasonable intervals during normal business hours for the purpose of inspection, or for the purpose of showing the premises to prospective purchasers or tenants, or for the purpose of making repairs, which the LESSEE is obligated to make hereunder but has refused or failed to make. The preceding sentence does not impose upon the LESSOR any obligation to make repairs.

In the event of an emergency, LESSOR or its agents or employees may enter the leased premises by the use of force or otherwise without rendering LESSOR liable therefor, and without in any manner affecting LESSEE's obligations under this lease. The reasonable exercise of any such reserved right by LESSOR shall not be deemed an eviction or disturbance of LESSEE's use and possession of the leased premises and shall not render LESSOR liable in any manner to LESSEE or to any other person, nor shall the same constitute any grounds for an abatement of any rent hereunder.

During the 6 months next preceding the expiration of this lease, the LESSOR may keep affixed to any suitable part of the outside of the building of which the leased premises are a part a notice that the leased premises are for sale or rent.

**5.7 Emergency Repairs.** LESSEE shall use its best efforts to notify LESSOR of the need for emergency repairs by telephone or any other means available whereupon LESSOR agrees to make such repairs as soon as practicable. If LESSEE is unable to notify LESSOR, LESSEE shall make such repairs and shall notify LESSOR as soon as possible after said repairs are made, the nature of such repairs, the cost hereof and the reason for making such repairs.

**5.8 Repossession By LESSOR.** At the expiration of this lease or upon the earlier termination of this lease for any cause herein provided for, the LESSEE shall peaceably and quietly quit the leased premises and deliver possession of the same to the LESSOR, together with all alterations, additions, improvements, mechanical installations, equipment, appurtenances thereto not removed from the leased premises pursuant to Article 4 hereof. The LESSEE agrees that at the time of delivery of possession to the LESSOR at the expiration of this lease, any and all alterations, additions, improvements, mechanical installations, equipment and appurtenances constructed or installed on or in the leased premises at its expense after the beginning of the term hereof and which have become the property of the LESSOR pursuant to Article 4 hereof shall be free and clear of any mortgage, lien, pledge, or other encumbrance or charge.

**5.9 Holding Over By LESSEE.** In the event the LESSEE shall hold over after the expiration of the term hereof, such holding over shall not extend the term of this lease but shall create a month-to-month tenancy at will upon all the terms and conditions of this indenture.

## ARTICLE 6 - DESTRUCTION OF PREMISES AND EMINENT DOMAIN

**6.1 Destruction of Leased Premises.** In the event of fire or other casualty rendering less than fifty (50%) percent of the floor area of the leased premises unusable, the LESSOR shall be obligated to repair same as soon as possible. In the event of fire or other casualty rendering more than fifty (50%) percent of the floor area unusable, then the LESSOR shall have the option of terminating this lease, or rebuilding. LESSOR shall notify LESSEE, in writing on or before the thirtieth (30th) day after the destructive event, of its intention to terminate or rebuild.

**6.1.1 Apportionment of Rent.** During the repair period rent shall be prorated on a square-foot basis.

**6.1.2 Time for Completion of Repair.** If the repair work or rebuilding is not completed on the one hundred twentieth (120th) day following the fire or other casualty, regardless of the percentage of floor area involved, the LESSEE shall have the option of terminating this lease.

**6.1.3 Destruction During Last Year of Term.** If the leased premises are damaged or destroyed to the extent of fifteen (15%) percent or more of its insurable value or the building of which they are a part shall be damaged or destroyed to the extent of fifteen (15%) percent or more of its insurable value, LESSOR at its election may terminate this lease by giving LESSEE written notice within 30 days after such damage or destruction.

If the leased premises are damaged or destroyed rendering more than fifty (50%) percent of the floor area unusable during the last year of the term of this lease, then LESSEE, at its option, may terminate this lease by giving LESSOR written notice within 30 days after such damage or destruction. Any option-to-renew notice under Section 2.4 given to LESSOR by LESSEE prior to the occurrence of such damage or destruction voids LESSEE's option to terminate under this Section regarding the then current lease.

**6.2 Eminent Domain.** If the entire leased premises or a portion thereof shall be taken under the exercise of eminent domain by any competent governmental authority, this lease shall terminate as of the date of such taking; and in that event the rentals due hereunder shall be apportioned between the parties hereto as of the date of such taking. In the event of such taking both the LESSEE and the LESSOR shall be entitled to compensation for their interests in the leased premises, in accordance with the rules and regulations of the governmental authority exercising the power of eminent domain.

## ARTICLE 7 - LIABILITY AND INSURANCE

**7.1 Liability.** LESSOR shall be free from all liabilities and claims for damages and/or suits for or by reason of any injury or injuries, to any person, persons, or property of any kind whatsoever, whether the person or property of the LESSEE, its agents or employees, or third persons, from any cause or causes whatsoever while in or upon said premises, or any part thereof during the term of this agreement, or occasioned by any occupancy or use of said premises, or any activity carried on by LESSEE in connection therewith, and LESSEE shall indemnify, protect, defend and save harmless the LESSOR, from all liabilities, charges, expenses, including counsel fees, and costs on account of or by reason of any such injuries, liabilities, claims, suits or losses, however occurring, or damages growing out of same.

**7.2 Insurance.** The LESSEE shall maintain liability insurance upon the premises in the amount of at least $ 1,000,000 per occurrence, to protect against liability arising from the use, occupation and enjoyment of the premises. The LESSOR shall be named as an additional insured under the policy of insurance and the policy shall not be cancelable without 30 day prior written notice to LESSOR. A copy of the policy shall be delivered to the LESSOR at the commencement of the term of this Agreement. In addition, the LESSEE shall maintain insurance to protect it against loss, occasioned by the destruction or injury to any betterments, improvements or fixtures, installed by it upon the premises during the term of this lease, and for any business interruption or other loss of revenues.

## ARTICLE 8 - ASSIGNMENT, MECHANIC'S LIENS, AND NOTICES

**8.1 Assignment and Sub-Lease.** The LESSEE shall not have the right to assign this lease to any third party without the prior written consent of the LESSOR, which consent shall not be unreasonably withheld. The LESSOR retains the right to assign this Lease Agreement and/or to sell or transfer the leased premises to a third party. No such assignment and/or sale shall relieve the LESSEE of any of its obligations hereunder and this lease shall be subordinate to any such assignment and/or sale by the LESSOR. LESSEE shall be provided written notice of any sale of assignment, but until the receipt of the same, shall have the obligation to make its rental payments to the LESSOR as provided herein.

**8.2 Mechanic's Liens.** In the event of the filing in Hillsborough County Registry of Deeds of any notice of a builder's, ~~supplier's~~ or mechanic's lien on the leased premises arising out of any work performed by or on behalf of the LESSEE, the LESSEE shall either

(a) cause such lien to be discharged or released, OR

(b) shall initiate legal proceedings to test the validity of the lien claimed, AND

if the LESSEE shall initiate legal proceedings to test the validity of the lien, the LESSEE shall

(c) cause such lien to be discharged or released by the posting of bond or otherwise, AND

(d) shall completely indemnify the LESSOR against any such claim or lien and all costs of such proceedings wherein the validity of such lien is contested by the LESSEE.

**8.3 Notices.** All notices at any time to be served by the LESSOR upon the LESSEE or the LESSEE upon the LESSOR, shall be in writing and sent by registered mail with postage prepaid, addressed to the LESSEE or LESSOR, as follows:

**LESSOR:** Richard G. Brown
Blaine Brown Corp.
20 Blaine Street
Manchester, NH 03102

**LESSEE:** Zelkjo Anic
325 Mast Rd.
Manchester, NH
or
Dalibor Kosic
642 Union St.
Manchester, NH

## ARTICLE 9 - DEFAULT, ARBITRATION AND HOLDING OVER

**9.1 Default.** If the LESSEE defaults in the payment of any rent and such default continues for fifteen (15) days, or if LESSEE defaults in the performance of any of the other terms and conditions in this lease and such default continues for a thirty day period after the service of written notice of such default by the LESSOR on the LESSEE, then the LESSOR may enter into and upon the leased premises or any part thereof and repossess the same, with or without terminating this lease, and without prejudice to any of its remedies for rent or breach of contract and in any such event may, at its option,

(i) terminate LESSEE'S right to possession of the premises by any lawful means, in which case this Lease shall terminate and LESSEE shall immediately surrender possession of the premises to LESSOR (in such event, LESSOR shall be entitled to recover from LESSEE all damages incurred by LESSOR by reason of LESSEE'S default, including, but not limited to, the cost of recovering possession of the premises and reasonable attorneys' fees in connection therewith);

(ii) recover from LESSEE the expenses of reletting, including the necessary renovation and alteration of the premises, reasonable attorneys' fees and any real estate commission actually paid with respect to said reletting; and (iii) recover from LESSEE the unpaid rent for the balance of the term, it being the obligation of LESSOR to make a reasonable effort to secure a new LESSEE so as to minimize LESSEE'S loss.

The foregoing rights and remedies given to the LESSOR, are, and shall be deemed to be, cumulative, and the exercise of one shall not be deemed to be an election, excluding the exercise by the LESSOR at any other or different time of a different or inconsistent remedy, whether allowed pursuant to this agreement, or under the laws of the State of New Hampshire, and shall be deemed to be given to the LESSOR in addition to any other and further rights granted to the LESSOR by the laws of the State of New Hampshire. The exercise or failure upon the part of the LESSOR at any time to exercise any right or remedy hereby given to it shall not be deemed a waiver by it of its rights to exercise such right or remedy at any other or future time.

**9.2 Termination.** This Lease will terminate in the event Lessor's mortgage, to which this Lease and the Leased Premises are subordinate, is in default.

## ARTICLE 10 - SUBORDINATION AND BINDING EFFECT

**10.1 Subordination.** This lease shall be subject and subordinate to any and all mortgages, deeds of trust and other instruments in the nature of a mortgage, now or at any time hereafter, a lien or liens on the property of which the leased premises are a part. The LESSEE shall, when requested, promptly execute and deliver such written instruments as shall be necessary to show the subordination of this Lease to said mortgages, deeds of trust or other such instruments in the nature of a mortgage.

**10.2 Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto.

## ARTICLE 11 - SIGNS AND AWNINGS

**11.1 LESSOR's Signs.** At any time within six months before the expiration of the lease term, LESSOR may affix to any suitable part of the leased premises a notice for letting the leased premises.

**11.2 LESSEE Signs, etc.** LESSEE shall not construct or place signs, awnings, marquis or other structures projecting from the exterior of the leased premises without the written consent of the LESSOR. LESSEE has the right to erect and maintain a customary identifying sign in the front of the premises at LESSEE'S expense, subject to the following:

(a) the design, configuration, size and location of the sign is agreed to by the parties and any such agreement has been memorialized by letter of Agreement and attached hereto; and

(b) subject to all applicable law ~~and~~ governmental approvals.

Customary signs and advertisements prepared in a professional manner which LESSEE may display from time to time in the windows of the leased premises are exempt from this Section.

## ARTICLE 12 - MISCELLANEOUS PROVISIONS

**12.1 Waiver.** Any consent, express or implied, by the LESSOR to any breach by the LESSEE or any covenant or condition of this lease shall not constitute a waiver by the LESSOR of any prior or succeeding breach by the LESSEE of the same or any other covenant or condition of this lease. Acceptance by the LESSOR of rent or other payment with knowledge of a breach or default under any term hereof by the LESSEE shall not constitute a waiver by the LESSOR of such breach or default.

**12.2 Governing Law.** This lease agreement shall be construed and interpreted in accordance with the laws of the State of New Hampshire.

**12.3 Force Majeure.** Except as expressly provided herein, there shall be no abatement, diminution or reduction of the rent or other charges payable by the LESSEE hereunder based upon, or claimed as a result of any Act of God, act of the public enemy, governmental action, or other casualty, cause or happening beyond the control of the parties hereto.

**12.4 Savings Clause.** The invalidity or unenforceability of a provision of this lease shall not affect or impair the validity of any other provisions.

**12.5 Entire Agreement; Amendments; Captions.** This lease contains the entire agreement of the parties and no representations, promises or agreements, oral or otherwise, between the parties not contained in this lease shall be of any force and effect. This lease may not be amended or modified except in writing executed by LESSOR and LESSEE. The captions of sections and paragraphs of this Lease are for convenience only and shall in no way enlarge or limit the scope or meaning of the provisions of this Lease.

IN WITNESS WHEREOF, the parties have executed this Lease on the date shown below.

Date: 3/5/03 ______________________
Richard G. Brown
Authorized for:
Blaine Brown Corp., Lessor

Date: 3/5/03 ______________________
Zelkjo Anic

Date ______________ ______________________
Dalibor Kosic

Date 3/5/03 Witness to all ______________________
Diane Demers

April 23, 2003

Amendment To Lease dated 3/5/2003, between Blaine Brown Corp, (LESSOR) and Zelkjo Anic and Dalibor Kosic, LESSEES.

Article 5,Paragraph 5.2 is hereby amended to read "Use of premises. The LESSEE agrees that it shall use the premises for the purposes of providing coffee shop and other light restaurant foods and services."

Date 4/23/03 ______________________
Richard G. Brown
Blaine Brown Corp., Lessor

Date 4/23/03 ______________________
Zelkjo Anic- Lessee

Date 4/23/03 ______________________
Dalibor Kosic-Lessee




13 Oct 2004

Appendix 7

1/3


XXXL ENT./ ENJ ENT./ FAMILY AFFAIRS RECORDS PRESENT......
2ND ANNUAL
PIMPS & HOES
$10 COVER
DJ ERKEL
SPINNING THE HOTTEST
OLDSKOOL & NEWSKOOL
HIP HOP R&B
REGGAE REGGAETON
COSTUMES REQUIRED
@ BOLERO'S
Nightclub
OCT 28th, 2004
18+ to Party 21+ to Drink
Cash Prizes For The Best Dressed
20 BLAINE ST. MANCHESTER N.H.
FOR MORE INFO. & DIRECTIONS CALL 603.321.892
XXXL: 603.682.7272 ENJ: 857.222.2872

Appendix 7




August 2004

Appendix 7 3/3

Tower Realty Group

1000 Elm Street ▫ Manchester, NH 03101
(603) 668-3800 ▫ (603) 668-9614 fax
info@TowerRealtyGroup.com

August 30, 2004

Zelkjo Anic
Bolero Social Club
20 Blaine Street
Manchester, NH

Mr. Anic:

The last few months, Mr. LaFontaine has been very patient with your business and helped you out in every way you have asked. However, this generosity has not been returned with any responsibility on your part. As we were hired to do, from this point on I must insist that you deal only with Tower Realty Group concerning any problems or payments with your space at 20 Blaine Street. We must work together to put you back on track and up to date with your rental obligations as per the provisions of your lease.

You are delinquent on your rent obligations and in default of your lease agreement. In just one year of ownership you have forced us to give you numerous warnings concerning delinquent rent, noise violations, trash pick-up, and the conduct of your customers. As of August 30, 2004 all of these issues still remain. There are bottles and other trash left every Saturday night throughout the parking lot and on the street in front of the building. A couple of weeks ago one of your customers backed their car into the front door of the adjoining office space and did significant damage (which you are responsible for). According to police reports there was a fight at Bolero on Saturday (8/7) / Sunday (8/8) that eventually ended up with one of your customers being stabbed by another. All of this is unacceptable and contrary to the conduct outlined in your lease agreement. No matter whether your customers are inside your restaurant or outside, they are still your responsibility.

will monitor

→ Not a customer denied access

Elm street

I have attached an invoice that will bring you up-to-date with your rent obligations. As you will also notice, starting again in September your rent will be due in full on the first day of the month. There will be no more concessions concerning your lease agreement and the responsibilities set forth in it. If your rent obligations are not met on time from this point forward you will force me to take action to end your lease. If there are any more conduct violations the police will be called in to deal with them directly.

It is unfortunate that the situation has escalated to this point. This is not strictly a financial problem you have created. The safety and security of other tenants and their vehicles at the building are at issue and this conduct will not be tolerated. We hope you take immediate action to correct this situation.

Sincerely,

Scott Forrester

Scott Forrester

Appendix 2

CP

IVAN S. CRNILOVIC, ESQ.
ANA C. PHILLIPS, ESQ.

CRNILOVIC & PHILLIPS LAW OFFICES

260 Haverhill St.(RT.110) Lawrence, MA 01840 | 978/557-5556 Tel 978/557-5576 Fax | icrnilovic@cplawoffices.com aphillips@cplawoffices.com | www.cplawoffices.com

25 October 2004

Re: *Notice to Quit/Zelkjo Anic (Bolero Social Club)*

Dear Mr. La Fontaine:

I have spoken with Mr. Christopher King, who works with this office and he informs me that he had a nice discussion with you regarding the Notice to Quit letter dated 15 October, 2004 and the letter from the Tower Realty Group dated 30 August, 2004.

Mr. King informs that you and he discussed as follows:

1. Mr. Anic acknowledges that there may have been occasional items of trash such as empty cigarette packs discarded on premises in the past, but he now has instituted a sign-off system in which individual employees and/or independent contractors of Bolero will initial the checklist with date and time after each and every event when they complete a clean up of the parking lot. As you are aware, Bolero is not open every day and clients of other establishments do frequent the area on a daily basis. While Bolero is not responsible for any trash that they leave in their wake, our client will remove such items during our sweeps of the area when we are open to the public.

2. The person who damaged a neighboring actually was no a patron of Bolero Social Club. Mr. Anic refused him entry and apparently being upset, he did then negligently through loss of control, drive his vehicle into the building. We are not aware of any legal authority that would render our client liable for that sort of activity, and his insurance company is in agreement with us on that conclusion.

3. There never has been a fight at Club Bolero and we are not aware of any police reports relative to this address since our client took possession of the premises. He runs a safe club with a very good "vibe;" Mr. King and I have both patronized the club and can unequivocally state that it is a safe and sound environment, otherwise we wouldn't be there.

4. To our knowledge, no one has reported Club Bolero as a nuisance.

As such, we hope that this closes the matter. In the event that it does not, however, please contact this office before the close of business, 29 October 2004 for further discussion.

Respectfully submitted,

(ACP)

Ana Crnilovic-Phillips, Esq.

Typographic error.

cc: Zelkjo Anic

Appendix 3

**Tower Realty Group**

November 16, 2004

Zelkjo Anic
36R English Village Rd.
Apt. 203
Manchester, NH 03102

Re: Notice to Quit – November 30, 2004

Mr. Anic:

We have received your recent payments attempting to bring your account up to date (still short $403.14). However, as discussed and outlined for your attorneys (Mr. King & Mrs. Phillips) there are far more issues outstanding besides just rent. You are reminded that you must still vacate the premises by November 30, 2004, **no exceptions**.

Please pay $403.14 to bring your account current before the move out date. This will leave only one more electrical charge that will be outstanding after you move out on November 30th. The bill will be deducted from any remaining security deposit.

We appreciate you paying your bills this month. We hope this signals compliance with the Notice to Quit and your intentions to handle this move out professionally.

Respectfully,

Tower Realty Management Group

**Tower Realty Commercial Group, LLC**
**1000 Elm Street ▫ 20th floor ▫ Manchester, NH 03101**
**(603) 668-3800 ▫ *info@TowerRealtyGroup.com* ▫ (603) 668-9614 fax**

Appendix 4

**CUSTOMER'S RECEIPT** DO NOT SEND THIS RECEIPT FOR PAYMENT KEEP IT FOR YOUR RECORDS

9239017864[illegible]

| | |
|---|---|
| PAY TO Robert La [illegible] | [illegible] |
| ADDRESS Tower Realty [illegible] | [illegible] LLC |
| | ADDRESS [illegible] |
| C O D NO. OR USED FOR Electricity [illegible] | [illegible] |

This receipt is your guarantee for a refund of your money order if it is lost or stolen, provided you fill in the Pay To and Address information on the money order in the space provided. [illegible] 2 years after payment. If your money order is lost or stolen, present this receipt and file a claim for a refund at your Post Office.

An inquiry Form [illegible] may be filed at any time for a fee. A replacement will not be issued until 60 days after the money order purchase date, provided the money order has not been paid.

Appendix 5

Tower Realty Group

November 18, 2004

Zelkjo Anic
36R English Village Rd.
Apt. 203
Manchester, NH 03102

Ana Crnilovic-Phillips
Christopher King
260 Haverhill Street
Lawrence, MA 01840

Re: Returned Check

Mr. Anic:

It seems as though our last letter was a little premature. Your check #105 for November rent has been returned to us for insufficient funds. We had hoped that your recent actions were finally a demonstration of professionalism and respect towards the owner and the property. However, this action has once again driven home the point that you are incapable of being an accountable and respectable tenant of the building.

The amount of the returned check was $1,200.00, plus a $10.00 return fee. Additionally, your account is still past due in the amount of $403.14. All total you owe $1,628.14 immediately. As I'm sure your attorneys have told you, the Notice to Quit does not relieve you of your contractual obligation to continue paying rent until the day you move out. Perhaps it is your intention to move out early which would be more than acceptable. Please advise us immediately if this is the case and we will prorate your rent for the part of November you still occupied the space. However, if this not the case we must remind you that you have to vacate the premises by November 30, 2004, **no exceptions**.

Respectfully,

Tower Realty Management Group

**Tower Realty Commercial Group, LLC**
**1000 Elm Street ▫ 20th floor ▫ Manchester, NH 03101**
**(603) 668-3800 ▫ *info@TowerRealtyGroup.com* ▫ (603) 668-9614 fax**

Appendix 6 1/2

Appendix 6
72

# NOTICE TO QUIT
RSA 540:3

| | | |
|---|---|---|
| TO: | Name: | **Zelkjo Anic** |
| | Street: | **325 Mast Road** |
| | City, State, Zip: | **Manchester, NH 03102** |
| | Name: | **Dalibor Kosic** |
| | Street: | **642 Union Street** |
| | City, State, Zip: | **Manchester, NH 03104** |
| FROM: | Name: | **Robert LaFontaine** |
| | Attention: | **Tower Realty Group** |
| | Street: | **1750 Elm Street** |
| | City, State, Zip: | **Manchester, NH 03104** |
| PREMISES: | Street: | **20 Blaine Street** |
| | City, State, Zip: | **Manchester, NH 03102** |

603.669.6361

OWNER
ROBERT LA FOINTER
557-1613

668-3801

LEASE: Lease between Landlord and Tenant dated September 1, 2002, executed March 5, 2003 and amended April 23, 2003 with respect to the premises.

DATE OF NOTICE: October 15, 2004

DATE TO QUIT: November 30, 2004

You are hereby notified and required to quit the PREMISES, above-referenced, occupied by you as tenant on or before November 30, 2004 (hereinafter the "Quit Date").

The reasons for this action are:

1) Default under Article 2 Paragraph 2.1 Rent
2) Default under Article 2 Paragraph 2.2 Additional Charges ✓
3) Default under Article 3 Paragraph 3.2 Subparagraph 3.2.2 Maintenance and Repair by LESSEE ✓
4) Default under Article 5 Paragraph 5.2 Use of Premises
5) Default under Article 5 Paragraph 5.2 Subparagraph 5.2.1 Condition of Premises ✓ (use)
6) Default under Article 5 Paragraph 5.3 Unlawful, Extra-Hazardous, Or Nuisance Use

NO proof. police will testify to that.

NOTE:
No tenancy shall be terminated for nonpayment of rent, utility charges, or any other lawful charge contained in a lease or an oral or written rental agreement if the tenant, before the expiration of the notice, pays or tenders all arrearages plus $15.00 as liquidated damages; provided, however, that a tenant may not defeat an eviction for nonpayment by use of this section more than tree times within a twelve month period.

Appendix 8(a) 1/2

All payments you give to the LANDLORD or the LANDLORD'S agent after the Quit Date regarding the PREMISES will not be construed or accepted as rent but shall be place in an ESCROW ACCOUNT by the LANDLORD pending the result of any eviction proceeding with the LANDLORD reserving all rights under this Notice to Quit and any subsequent eviction proceedings. Such payments by you after the Quit Date will specifically not reinstate any rental or tenancy agreement (including, but not limited to, the Lease). Should you still owe money to the LANDLORD after the eviction proceedings, such amount will be deducted from the ESCROW ACCOUNT and the remainder (if any) returned to you.

AGENT 10/15/04

Landlord or Agent

**CERTIFICATION**

**I hereby certify that on October 15, 2004 I left an original of this document at 20 Blaine Street, Manchester, NH 03102 and sent an additional original via Certified U.S. Mail to each of the tenants home addresses, listed above.**

AGENT 10/15/04

Landlord or Agent

Appendix 8(a) 2/2

**Tower Realty Group**

December 9, 2004

Zelkjo Anic
36R English Village Rd.
Apt. 203
Manchester, NH 03102

Ana Crnilovic-Phillips
Christopher King
260 Haverhill Street
Lawrence, MA 01840

Mr. Anic:

We received your cashier checks in the amount of $2,200.00 on December 7, 2004. Since you are no longer a tenant at the building and you have decided to litigate this fact then we will accept your payment as an occupancy fee. The outstanding invoice is also attached which still includes utility payments for the month of October and November.

Unfortunately, it has also come to our attention that there was another fight at your establishment this past weekend. The fight spilled out of your establishment and into the parking lot of one of the neighbors. There was monetary damage done to the neighbor's building including a broken window. There was also a significant amount of blood in the parking lot and on the neighbor's building. The neighbor is looking for compensation and this will be your responsibility not ours. Just by kicking your unruly patrons outside does not relieve you of the responsibility and burden of their actions. This incident is just another example of the disrespect you have for the owner, the building and the neighborhood.

Respectfully,

Tower Realty Management Group

Appendix 8(b)

**Tower Realty Commercial Group, LLC**
**1000 Elm Street ▫ 20th floor ▫ Manchester, NH 03101**
**(603) 668-3800 ▫ *info@TowerRealtyGroup.com* [redacted]**

IVAN S. CRNILOVIC, ESQ.
ANA C. PHILLIPS, ESQ.

CRNILOVIC & PHILLIPS
LAW OFFICES

260 Haverhill St.(RT.110) Lawrence, MA 01840 | 978/557-5556 Tel 978/557-5576 Fax | icrnilovic@cplawoffices.com aphillips@cplawoffices.com | www.cplawoffices.com

23 December 2004 **VIA FAX AND REGULAR U.S. MAIL**

Re: *Bolero v. Tower Realty Group; fraud allegations*

To all concerned:

On or about 9 December, 2004 you continued to tortiously interfere with our client's Lease between Bolero, LLC and Robert LaFontaine by issuing a letter that stated Bolero is no longer a tenant in the building. The letter was unsigned for some reason but it is safe to assume that both parties present at today's hearing were aware of the letter's content before it was sent.

You issued such statement despite the fact that your client had not yet even *filed* for an RSA 540 Writ of Possession, much less obtained service, making such claim *ipso facto* fraudulent. Perhaps if you or Mr. LaFontaine had returned any of our client's dozens of phone calls you would have been in better touch with him to understand the material procedural and substantive flaws of your statement, which was made to a person for whom English is a second language.

At the close of the proceedings, in front of my client, you did then threaten me with a Fraud allegation because I inadvertently signed a letter in my name with Attorney Phillips' signature block. Your language was profane, unprofessional and intolerable. I will take whatever action I deem appropriate to see to it that you never repeat that activity.

As I instructed you after your profane outburst, if you think you have an action in Fraud because I accidentally signed the letter instead of Attorney Phillips (but using my name and not forging hers) then move forward on same, and I will address your alleged concerns. Be certain to include a copy of this letter in the event you pursue such a claim.

Whatever you do, don't you ever again use profane language in my direction.

Perhaps you should be more concerned about your own actions in this case, for which our client will seek recompense in full measure.

Very truly yours,

Christopher King, J.D.

cc: Bolero, LLC
Ana Crnilovic-Phillips, Esq.

Appendix 10

603 627-5612
Stuart

The Law Offices of
# Deachman & Cowie
Professional Association
38 W. Brook Street
Manchester, NH 03101

COPY

Ross V. Deachman
Thomas W. Cowie
Wm. John Deachman

Phone: (603) 665-9111
Fax: (603) 665-9090

February 2, 2005

James A. Hardy, Sheriff
Hillsborough County Sheriff's Department
329 Mast Road
Goffstown, NH 03045

Re: Zelkjo Anic and Dalibor Kosie

Dear Sheriff Hardy:

Enclosed please find three (3) **original** Notices to Quit, in connection with the above-referenced matter. Would you kindly complete service on the Defendants by serving an **original** Notice to Quit to Zelkjo Anic at **325 Mast Road, Manchester, New Hampshire** and to Dalibor Kosie at **642 Union Street, Manchester, New Hampshire.** Kindly complete service before **February 16, 2005.**

After service has been completed, kindly make your returns to this office along with your statement of charges, and we will promptly honor same. Thank you for your cooperation in this regard.

Sincerely yours,

W. John Deachman

WJD/lb

Cc: Client

WJDeachman
@DeachmanLaw.com



Appendix 11

IVAN S. CRNILOVIC
ANA C. PHILLIPS, ESQ.

CRNILOVIC & PHILLIPS
LAW OFFICES

260 Haverhill St.(RT.110)
Lawrence, MA 01840
978/557-5556 Tel
978/557-5576 Fax
icrnilovic@cplawoffices.com
aphillips@cplawoffices.com
www.cplawoffices.com

3 January 2005 **VIA FAX AND REGULAR U.S. MAIL**

Re: *Bolero v. Tower Realty Group Status Update*

To all concerned:

You should be aware that Bolero is one of a few, and possibly the *only* Bosnian club in Southern New Hampshire. As such, given my position as a business liaison with the Nashua Mayor's Committee on Ethnic Awareness, I find it appropriate to place the Committee on notice of Tower Realty Group and/or Mr. LaFontaine's groundless efforts to evict Bolero from the premises.

As of this writing I do not believe you have effected service on our client. Any future attempts to unlawfully evict Bolero will result in my direct appeal to Mayor Streeter for further review and discussion.

Very truly yours,

Copy

Christopher King, J.D.

cc: Bolero, LLC
Ana Crnilovic-Phillips, Esq.
Blind Copies

Appendix 12
1/4

IVAN S. CRNILOVIC, ESQ.
ANA C. PHILLIPS, ESQ.

CRNILOVIC & PHILLIPS
LAW OFFICES

260 Haverhill St.(RT.110)
Lawrence, MA 01840 | 978/557-5556 Tel
978/557-5576 Fax | icrnilovic@cplawoffices.com
aphillips@cplawoffices.com | www.cplawoffices.com

8 February 2005 **VIA FAX AND REGULAR U.S. MAIL**

Re: *Bolero v. Tower Realty Group and Bob Lafontaine*
(corrected for typographical error)

Dear Attorney Deachman:

Please be advised that this office will obtain New Hampshire counsel to represent Mr. Anic and Bolero, LLC in the Notice to Quit/Action for Writ proceedings your client has initiated.

Unless there is a substantial quantum of information or evidence of a different character than that which we reviewed at the close of 2004, we will proceed with counter and cross claims of Breach of Contract and Tortious Interference against your client and Tower Management/Realty Group, respectively. There may also be a Motion for Sanctions and we will most certainly put Mayor Streeter and the Ethnic Awareness Committee on Notice of the fact that your client and Tower Management/Realty has unreasonably attempted to evict the only Bosnian/Yugoslavian club in the Southern Tier of New Hampshire.

Has your client been forthcoming with you about the history of this case?

Very truly yours,

Christopher King, J.D.

Ana Crnilovic-Phillips, Esq.

cc: Bolero, LLC

Appendix 12

2/4

IVAN S. CRNILOVIC, ESQ.
ANA C. PHILLIPS, ESQ.

CRNILOVIC & PHILLIPS
LAW OFFICES

260 Haverhill St. (RT. 110) | 978/557-5556 Tel | icrnilovic@cplawoffices.com
Lawrence, MA 01840 | 978/557-5576 Fax | aphillips@cplawoffices.com | www.cplawoffices.com

12 February 2005 **VIA FAX AND REGULAR U.S. MAIL**

Re: *Bolero v. Tower Realty Group and Bob Lafontaine; Response to pending Notice to Quit*

Dear Attorney Deachman:

At this point I feel obliged to tell you some things that I neglected to mention earlier when I noted the pending cross and counter claims, as I was busy gathering my facts. I now have completed my review and note as follows:

1. Your client will be met with a Civil Rights Action in any and all applicable venues for discriminating against Mr. Anic based on National Origin and Ethnicity, as well as client's and his derivative 42 U.S.C. @1981 claims for racial and colour discrimination regarding your client's comments to him about Wednesday evening's Hip-Hop nights and the patrons he draws for that evening. We will in file in Federal Court a Motion for a Temporary Restraining Order, then pursue this litigation to Jury Trial, at which point the Court will likely assess some measure of attorney fees against your client.

2. Our client will not vacate the premises just because your client desires to establish a Gentlemen's Club. You may want to query your client about his comments to Mr. Anic about that as well.

3. I will be approaching the NAACP and Mayor Streeter with a copy of this letter on Tuesday, 15 February 2005 if we don't hear that this matter has been withdrawn. In unlawfully attempting to terminate the activities of the only Bosnian/Yugoslavian club in the Southern Tier of New Hampshire, your client is also unlawfully trammeling the interests of Black patrons. As Ms. Crnilovic-Phillips is a Yugoslavian Attorney, and as I am a (predominately) Black Civil Rights Attorney, your client is going to be met with substantial resistance at each and every step of the way, possibly for several years. The Tower Realty attorney's use of profane language in my direction, overheard by Mr. Anic and previously documented, does your client no favors either.

4. At present I am busy on a book and movie project about my life. It is strenuous and the hours are demanding. But I will certainly take time out to pay special attention to this case, regardless of whether we pro hac vice this case or refer it.

Again I ask, has your client been forthcoming with you about the history of this case?

Very truly yours,

Christopher King, J.

ACP
Ana Crnilovic-Phillips, Esq.

cc: Bolero, LLC
blind copies

Appendix 12
3/4

IVAN S. CRNILOVIC,
ANA C. PHILLIPS, ESQ.

CRNILOVIC & PHILLIPS
LAW OFFICES

260 Haverhill St.(RT.110) Lawrence, MA 01840 | 978/557-5556 Tel 978/557-5576 Fax | icrnilovic@cplawoffices.com aphillips@cplawoffices.com | www.cplawoffices.com

18 February 2005 **VIA FAX AND REGULAR U.S. MAIL**

Re: *Bolero v. Tower Realty Group and Bob Lafontaine*

Dear Attorney Deachman:

We write by way of follow up to our earlier correspondence in general, and specifically regarding my telephone call to your office on the evening of 16 February, 2005 in which we inquired if your client was going forward or not on the Eviction, as service has not been effected yet and there is room for everyone to back away quietly.

Keep in mind that we have substantial grounds to file a *prima facie* derivative 42 U.S.C. 1981 claim even if your client *does* back away from this, and we will find our client competent area counsel if necessary to proceed after filing. In lieu of all that we promise to walk away if your client promises same. But we need an answer by Close of Business today, 18 February 2005 or we will file at the top of the week.

We must protect our client's interests as you must do the same for yours. Please advise.

Very truly yours,

Christopher King, J.D.

ACP

Ana Crnilovic-Phillips, Esq.

cc: Bolero, LLC

Appe-dix 12
4/4